Madam Clerk, please call the next case. 314-0403 Manteno Community Fire Protection District v. Robert Cartel Counsel, you may proceed. May it please the Court, Counsel. John Fasola on behalf of the employer, Manteno Fire Protection District. In this case, the Workers' Compensation Commission issued a decision, and in so doing, they had reviewed two volumes of evidence contained in the transcript, including a review of the medical records, evaluation of the testimony of the claimant, and evaluation of opinions from respective expert physicians. And after doing so, the majority of the Commission panel determined that the claimant had failed to meet his burden of proof on the issue of causal connection. When they issued their findings, they issued their decision in a 13-page opinion with 28 paragraphs of factual findings that they felt supported their conclusions. Let me ask you this. Sure. Was the Commission's decision based at least in part on its assessment of the credibility of the claimant? Absolutely. All right. So then how then do we, isn't there a great body of law that says the questions of credibility wait to be given to the evidence? We are to defer to the Commission? Yes, that's exactly my point. Because in our position is that the circuit court then, in overturning the Commission, inappropriately overturned the Commission by interjecting her own determination of what she felt the evidence showed as opposed to deferring to the Commission. Our position is that the Commission's decision was entitled to deference, that it was not necessarily afforded in this particular case, for the very reasons that you've just expounded. I mean, the two issues that the Commission found most compelling was, first of all, the credibility of the claimant, and second of all, a weighing of the respective opinions of the medical experts. Were there differing opinions of the experts? Were there differing opinions? Certainly. I mean, Dr. Zellwey examined him before Dr. Hain ever diagnosed the occipital neuralgia, right? Correct. And Zellwey never opined about that. He didn't opine specifically on the occipital neuralgia. That doesn't mean that he didn't give an opinion. His opinion was that the claimant suffered from chronic headaches and that what he was exhibiting at the time of Dr. Zellwey's examination did not indicate anything different than the chronic headaches that he had experienced over time. He actually said that the cause of the symptoms was unclear. Well, he did and he didn't. I mean, I think it's an overstatement, which I think the circuit court focused on, to say that it was unclear. What he said was that there were no objective findings that specifically gave him the ability to diagnose what this man's subjective complaints were. So there was a disconnect between the subjective complaints and his objective findings, which I think is part of what Dr. Zellwey found to be notable. From a medical standpoint, this seems like a situation where the claimant went to multiple doctors, none of whom could figure out what was going on until he got to Hain. That's certainly the claimant's attorney, I'm certain, will make that point. The commission had the opportunity to look at that. The commission evaluated that, and what they ultimately found is that Dr. Hain's conclusions were based on, to some extent, a lack of foundation because he didn't have complete evidence, and his findings, quite frankly, were not necessarily consistent with what he, in his own testimony, indicated occipital neuralgia should show. It's very clear that he was not aware of the headaches that the claimant had had over time, that the claimant had had preexisting to this state of loss. And so that was not part of the consideration when he made his initial diagnosis. In addition, there were also findings that were not necessarily consistent with what the diagnosis would normally entail. He said that typically this condition is caused by trauma to the back of the head. There's no trauma to the back of the head in this instance. What the petitioner testified to, or what the claimant testified to, rather, and what Dr. Hain apparently reached his conclusions based upon, were things such as the fact that he had, was doing butterfly exercises and felt an immediate popping or snapping sensation in the back of his head. And again, that goes back to the credibility of the claimant. There's not necessarily evidence of that in his initial presenting medical records, which are facts that Dr. Hain assumed that may not necessarily be true. It was like two weeks before he mentioned the popping or snapping, right? Two days, two weeks? Correct. Correct. And there's more than just the popping and snapping. One is what type of exercise he was doing. Was he running on a treadmill? Was he doing butterfly exercises? Did he have a popping and snapping sensation? Did he, for example, have pain to the side of his head as opposed to the back of his head? And one of the things that I found notable is when you look at the record of what he said to the emergency room physician, there's no notice, no indication that he ever complained, for example, of being so dizzy that he was falling into the machine or having visual acuity changes. This man's a paramedic. I mean, those are significant symptoms. To use the simplest terms, what you're saying is the commission found that the claimant's testimony was really not credible in light of the conflicting histories, pre-existing conditions, and it also then adapted Zellbe's opinion, found that was more persuasive. Correct. And the circuit court said what in light of all of that? I feel differently. I mean, basically what the circuit court said was that there was a majority opinion in dissent, and I'm not trying to be cavalier about this, but what the circuit court essentially said was I like the dissent better, and I don't think that's her promise to do. That's exactly what she said. Well, again, we reviewed the decision of the commission, but still, I wanted to find out, just to get an insight into what the thinking was at the circuit court level. I mean, that seemed to be the circuit court's conclusion, is that she felt that the reasoning of the dissent was well-founded at the commission level, and so she chose that opinion as opposed to the majority opinion, and I think that's improper weighing of the evidence pursuant to the manifest weight standard. The manifest weight standard, and you gentlemen are well familiar with it. I don't need to cite the law to you, but particularly on issues of credibility and on issues of weighing respective medical opinions, those are the specific areas with which the commission is charged with the responsibility to make a determination. They made a determination based on those factors. They gave their specific reasons why they made that determination. They cited factual findings in multiple paragraphs of factual findings. They're also entitled to raise inferences and reach conclusions from those factual findings, which they explain in over three pages of conclusions and inferences in their opinion. And how, looking at that, can you say that there was not a factual basis on which they could have reached that decision? You gentlemen may have felt differently if you reviewed it independently. The circuit court obviously felt differently if she weighed it independently. Did the commission have a factual basis which could support their conclusions? Our position is clearly they did. It's a similar situation as to what Your Honors found in the Dig Right In landscaping case within the past couple of years, where you felt that particularly to the extent that the commission had reached an opinion based on credibility findings and respective medical opinions, that it was inappropriate for the circuit court to step in and say, I'd review the evidence differently and overturn it. In regards to the injury occipital neuralgia, or at least what Dr. Haynes had diagnosed, what was the evidence as to the mechanism of the injury? What opinions were out there? I saw a therapist had written that it was due to increased active contraction and or shortening of the right occipitals. I'm trying to get an understanding of what this injury was that was testified to. Well, that's what makes it so difficult because you have to rely on, is the testimony of the claimant as to what he was doing at the time credible compared to what he reported medically when he initially received his medical treatment? It seems to be that Dr. Haynes is saying that in doing the butterfly exercises he was doing, that there's some sort of stretching component that could stretch the nerve, although he also then went on to say that that's not the typical presentation. The typical presentation is a blow to the head. That's how you get occipital neuralgia. But what's being stretched? I'm not understanding. The occipital nerve, it's my understanding, neuralgia would reflect that there's pain to a nerve. So there's an occipital nerve that comes out of, as I understand it, the structure of the cervical spine, that there's some sort of damage to that. Okay. So, again, I mean, based on really clearly a manifest weight standard, it's our position that the commission was entitled to reach a decision based on facts. They reached that decision. And whether or not the circuit court judge would have independently come to a different conclusion, that's not sufficient under the manifest weight standard to overturn the commission, and therefore we believe the circuit court's decision should be reversed. Thank you. Thank you, counsel. Counsel, you may respond. Good morning. Counsel Marilyn Kosin on behalf of Robert Hartel. I'd like to start out by saying this is not a headache case. And what I mean by that, this is a case involving an injury to an occipital nerve by Dr. Hayne. I'd like to start out by saying this is a stipulated accident that the respondent is putting aside. And what I mean by that is this accident was agreed to, that it occurred, on a butterfly machine by the Mantena Fire Department. They have never contested that there was an accident on July 24, 2011. They never want anybody in that trial to say it was a treadmill. They agree this is a stipulated accident. And I think that's very important in terms of the petitioner's credibility because the commission is not saying that he wasn't doing what he was doing and is on witness. So what we have here is an undisputed accident. We do, Your Honor. And the real issue is, is this condition of ill-being related to that? Is that correct? Correct. So what about that condition of ill-being? What's the evidence to say that it was connected from your standpoint to this incident that occurred while at work? Correct. Which is not argued about. Correct. And what I will go through is we have some issues with an emergency room record, but then we have ten doctors who are trying to diagnose this gentleman. He goes through every neurology, I'm going to mispronounce it, the ear neurologist and all that, until you get to Dr. Hayne. And I think it's important in what the circuit court and Commissioner Terrell are trying to say is he didn't have an exacerbated headache on July 24, 2011. He injured, as I agree with Respondent Wade to describe, the tearing of a nerve, fraying or tearing. He's doing a butterfly pull, pretty intense exercise with his arms. He traumatizes his nerve, which in turn exacerbates his preexisting migraine condition. He finally, finally, when he gets to Dr. No. 8, Dr. I'm going to, I don't know how to pronounce this, Sweka, S-W-E-K-A, says, you've had migraines your entire life. This is not an exacerbation of a migraine. It's not that kind of a headache. With all due respect to the majority commission, I don't think they understood exactly what Dr. Hayne was trying to explain. So you injure the nerve itself. That is going to cause you to have your migraines to flare up. Not only pain, but this incredible dizziness. He diagnosed that. Dr. Zellbe, with all due respect to Dr. Zellbe, if I may, say all the problems we have with Dr. Zellbe, and I know this, we don't want to weigh doctors, but a doctor should have a foundational basis for its opinion. Well, put aside Dr. Zellbe's opinion here for a moment. Would the following portion of Dr. Sargent's history lend support to the commission's decision? In that consultation note by Dr. Sargent, he wrote that the claimant came in with right parietal pain that started while performing very vigorous exercises. He noted that the claimant had some issues with this before. Apparently he saw one doctor for it who said he had sinus issue a couple weeks ago. Then last Friday while dancing, again, a vigorous physical exercise, he experienced very severe right temporal pain and temporal parietal pain. Would that provide support to the commission? I'm going to say no because what that is is a real cherry picking of this gentleman's medical history. And the reason I say that is he didn't know if he had sinus or migraines. He testifies that I didn't know that. So when I would go see some doctors previously, I actually thought it was sinus behind my eyes, temporal, never the back of the right side. So if you just look at that, out of context of what this gentleman testifies to is, at trial I didn't know. I'm eventually, thankfully, diagnosed with migraines. Somebody tells me they were migraines all along before the sinus headaches. That little snippet is in from an early treating record when he walks in the door. He is honest as they come about what he was doing, but nobody's contesting what he was doing. He is just describing it. And I said, perfect, I think you did a fine job. A mere few days later, he's trying to figure out why this is not going away and this is not one of my headaches, okay? I'm still, nine days later, I'm telling people I've got a snap and a pop and I'm not making glibly on that. But the commission even was trying to figure out, did he say that? We have ten doctors here. Even Dr. Zellweg, he mentioned a snap and a pop, that I've had headaches. I don't know what these headaches are. No one's telling me until doctor, until we actually, I'm sorry. That preceded the dancing and vigorous exercise? He says that. But again, the dancing and the vigorous exercise, he had headaches. We are never. No, I'm asking the time frame. It's before the accidents, of course. That's what I thought. Oh, yes, it's before the accidents. And this gentleman, I mean, no one is contesting that he didn't have headaches. And in fact, when Dr. Haynes. And these were migraine headaches. I mean, these were extreme headaches, right? Correct. He's finally diagnosed with migraine headaches. This is a regular person. And this was before this popping and snapping, right, the migraine headaches? Didn't he have them before? He thought they were sinus, but apparently they were truly migraine headaches. He wasn't diagnosed with the migraines until long after this accident. Correct. That's correct. About nine months later, when he, right before he's going to see Dr. Haynes, he's over at the Rush Doctors, and like I said, I don't want to mispronounce her name, but he is diagnosed with a migraine as a condition. And that's what Dr. Haynes tries to truly explain. But there was an injury. And when the circuit court focuses on that, one thing that I know we rely on the commission, but there was, I think, a very important comment that she makes. It doesn't matter. When the petition is looking at credibility on headaches, as she says, it's irrelevant. Why? It is irrelevant. Because if it was sinus or migraine, he had trauma on that day. He had the trauma to the occipital nerve. So when she's saying you're all talking about headaches, headaches, and headaches, we're missing the true point of what happened to this gentleman. And this took a firefighter, Hartel, a firefighter, a long time to get this diagnosis, a very, very long time. Let me just cut to the chase. Of course. You can make a very good argument, I think you are, as to the specific nature of the injury, the pain he sustained in supporting the claim. But, again, you know the standard review. We are confronted with a well-settled body of law that says we do not substitute our judgment for that of the commission, particularly in matters that involve conflicting medical evidence and assessment of the credibility of the claimant. So when he confronts you with that, on what basis do we overturn this decision? You do because it's a stipulated accident. We're not challenging. But on the credibility issue, you would not be challenging the petitioner at all. What you would be doing is telling the commission cherry-picking at the very beginning. It's not like he says I had an accident someplace else. There was something truly in those Riverside medical records, very, very unusual. I was dancing, and then I went to work, and I don't know what it was. You know, something that everybody would shake their head and say, you know, we really have to defer to the commission. They only can use that. Everything else he says is credible. And you have Dr. Zalby without any foundation. I know you guys probably, I'm sorry, already know the reasons why I'm going to tell Dr. Zalby. And you have such a well-respected doctor diagnosing this gentleman. And that diagnosis really lends all the credibility to what the petitioner has been saying all along. I've had the headaches. I didn't know what they were. Now you've explained that I had migraines and I had a trauma on July 24th. Well, he had headaches before this incident. Absolutely. When he worked, he was able to do his job. After this incident, he couldn't do his job. No, because what is striking about Dr. Zalby sending a firefighter back to work with very major dizziness, my understanding of the injury, not being the physician, is that— Correct. Correct. Never, never, every doctor, and I counted all nine of them until we get to Dr. Zalby, never gave him a full duty, unrestricted, go back to work. The only one who does that is Dr. Zalby, which is— So he was working with migraines before. Correct, he was. So there's an undisputed incident, and then there's medical evidence of this nerve injury. Is that correct? Correct. And then there is evidence of unfitness for duty thereafter. That's correct. That's correct. And this is a 19—ironically, this is unfortunately, I would say, a 19B matter. Treatment was denied for their treatment with Dr. Hain and Dr. Lubenow. In order to get this guy to work, you want to try to deaden that nerve. He's still going to have his migraines, but what you're going to do is you're going to eliminate the neuralgic pain, hopefully reduce that dizziness, but we are here because that was not ever provided by Mentino. They cut this gentleman off completely. Here he is today with—not able to do his work and not be able to get his treatment from 2011. Again, I don't—I think there are instances where an opposite conclusion is present. Commission should be afforded deference. This is a case where I believe the facts, when you look at them in their totality on a stipulated accident occurring to a gentleman, taking a long time to get a diagnosis, and there is only one diagnosis here, it is not Dr. Zellwey. In the record we point out he truly says unclear. That's not any causational opinion whatsoever. Dr. Bartel starts to go to all these doctors and honestly tell them what he's experiencing and to just nail his credibility not on what he testified to, but on what you find in a Riverside medical record, I think an opposite conclusion as noted by Commissioner Terrell, the arbitrator, and Judge Albrecht in her decision. And I guess that the arbitrator's decision, which fully considered what benefits he should be entitled to medically and TTD-wise, be reinstated at this time. If there's any more questions, I would entertain them. I don't believe there are. Thank you, Counsel. Counsel, you may reply. If I could just make one point very briefly, just to touch on one of the comments that Counsel made, is in the circuit court decision, obviously, as we've already discussed, the Commission had made findings on credibility. And I think Counsel said that the circuit court judge said that they weren't relevant. And actually what the circuit court judge said that is so disturbing is she called them meaningless. And that's, to me, another example of how the circuit court judge in this instance overstepped her bounds by saying the credibility findings, which were found on numerous occasions by the Commission and set out in detail in their decision, to say that those are simply meaningless is not giving the appropriate documents to the circuit court. What was the sketch for Zellwey's opinion? Dr. Zellwey's opinion was that there were no objective findings that were supportive of the subjective complaints. He says he has headaches. He says he has dizziness. There's no way for a doctor examining him to say he doesn't have those symptoms. He says he has those symptoms. We'll accept that he has those symptoms. But there was not objective evidence to indicate that he had an actual physical injury. And to the extent that he had a chronic history of headaches, his history at the time of Dr. Zellwey's examination was consistent with that. He was still having headaches, which Dr. Zellwey felt was a chronic condition that he had had for some period of time. What did he say was not related to his accident? I'm sorry? What condition did he say was not related to his accident? The condition that he was complaining of, the fact that he was complaining of disabling headaches and dizziness, Dr. Zellwey's opinion was that there was not evidence of a causal connection between the activities he was doing at the time and that condition. But he took that as a given. He had that condition of ill-being at the time he saw him. He can't really say he doesn't have headaches. I mean, if the gentleman says he has headaches, you have to accept his word for purposes of the examination that he has headaches. I think there is a flavor in Dr. Zellwey's report that there was nothing diagnostically that he saw that could explain why he had those headaches other than he had a chronic history of headaches. But Zellwey never reexamined him after Hain diagnosed him with the occipital neuralgia. That's correct. So Zellwey never directly opined that Hain was wrong about that. He did not give him. And in fact, something like seven or eight other doctors had examined him and had not diagnosed the occipital neuralgia. Correct. And the commission considered that, and their factual findings indicate that they considered that. And they considered the diagnosis of occipital neuralgia that was made by Dr. Hain and what it was based on and whether or not, for example, counsel mentioned more clearly he had fraying of the nerve. There's no objective evidence that he had fraying of the nerve. There's Dr. Hain did a test where he pressed on the head and he had a pain response. And that's the end-all, be-all to the diagnosis that Dr. Hain gave was this one pain response. Wasn't there also some kind of a block or whatever which relieved the pain? There's a block that was done initially that did not relieve the pain. And a second block. A second block that relieved the pain but apparently didn't resolve the dizziness because he was still complaining he had a significant dizziness. So, I mean, again, the commission was entitled to weigh that and determine how much weight to give to that finding, which I think if you look at their findings, they appropriately did. Thank you. Thank you, counsel, both for your arguments in this matter of partakement and advisement. We in this opposition shall issue an appropriate standing recess until 1.30.